ORDERED.

**Dated: November 02, 2016**

K. Rodney May
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
**www.flmb.uscourts.gov**

**In re** **Case No. 8:12-bk-15725-KRM**
**Chapter 11**

**BAMBI A. HERRERA-EDWARDS,**

**Debtor.**
**_______________________________________/**

**BAMBI A. HERRERA-EDWARDS,** **Adv. Proc. No. 8:13-ap-641-KRM**

**Plaintiff,**

**vs.**

**BERNARD EDWARDS COMPANY, LLC, and JESS S. MORGAN & CO., INC.,**

**Defendants.**
**_______________________________________/**

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL JUDGMENT**

On April 4, 2014, Bambi Herrera-Edwards, the debtor ("Debtor") in the above-captioned Chapter 11 case (the "Main Case"), filed a motion to reject executory portions of a 1997 Co-Publishing Agreement ("Motion to Reject"), seeking to establish her ownership of the

administration rights over her share of the music copyrights that were owned by her late husband, Bernard Edwards.[1]

On July 29, 2013, Debtor (or "Plaintiff") filed the above-captioned adversary proceeding ("AP 641") against the Bernard Edwards Company, LLC ("BEC"), and Jess S. Morgan & Co., Inc. ("JSM") (collectively, the "Defendants"), including a later-filed Amended Complaint.[2] Plaintiff seeks adjudication of whether (1) JSM is entitled to collect 5% of gross revenues before she receives her 37½% of the music copyright income and (2) she is entitled to receive, in addition to income from the copyrights, 37½% of the artist and producer royalties from Bernard Edwards' music career. Plaintiff alleges that her share of the artist and producer royalties has been improperly withheld from her since the closing of Edwards' probate estate on December 31, 1999.

The Motion to Reject and AP 641 were tried together.[3] At the close of Plaintiff's case-in-chief, Defendants made an *ore tenus* Motion for Judgment on Partial Findings pursuant to Fed. R. Civ. P. 52(c) (the "Motion"). Plaintiff filed a written Response to the Motion ("Response") (Doc. No. 254); Defendants filed a Reply thereto (the "Reply") (Doc. No. 255).

Defendants' Motion is due to be granted. On September 9, 2016, the Court's ruling was

---

[1] Main Case, Doc. No. 370. With administration rights, a person has control over the exploitation of a copyright, including the receipt of income therefrom.

[2] AP 641, Doc. No. 52. BEC is a limited liability company whose members include the six children of Bernard Edwards – Michael Edwards, Mark Edwards, Bernard Edwards, Jr., Portia Vrtiak, Leah Edwards, and David Edwards. *See* Trial Tr., March 4, 2016, Pg. 189 (Vrtiak).

Citations to testimony from the record from Trial will be cited as "Trial Tr., date, Pg. __, Lns. __ (Witness Last Name)."

[3] On February 24, 2016, in the Main Case, Defendants filed a Motion for Summary Judgment as to Debtor's Motion to Reject Executory Portions of Co-Publishing Agreement and Incorporated Memorandum of Law (the "Motion for Summary Judgment"). Main Case, Doc. No. 709. On March 1, 2016, Plaintiff filed her Response to the Motion for Summary Judgment. Main Case, Doc. No. 726. The Court heard oral argument on March 1, 2016, but deferred ruling on the Motion for Summary Judgment until the conclusion of trial.

announced on the record in open court. This written decision clarifies that oral ruling and provides additional citations to the trial record.[4] This memorandum opinion constitutes the Court's findings of fact and conclusions of law, in accordance with Fed. R. Bankr. P. 7052. The findings of fact shall, where necessary or appropriate, be deemed to be conclusions of law and, where necessary or appropriate, conclusions of law shall be deemed findings of fact.

**Findings of Fact**

1. Bernard Edwards was a well-known guitarist, songwriter, and producer whose work included such compositions as "*Dance, Dance, Dance*," "*Everybody Dance*," "*Le Freak*," and "*We Are Family*."[5] He was a founding member of the popular funk/disco band *Chic*.[6] Prior to his death, Bernard Edwards employed Wallace Franson ("Franson") and JSM to manage his business and financial affairs.[7] As part of this arrangement, he and Franson had orally agreed that JSM would take a perpetual fee of 5% of his gross income.[8]

2. Bernard Edwards died on April 18, 1996.[9] At that time, he had six children: Michael Edwards, David Edwards, Portia Edwards Vrtiak, Leah Edwards, Bernard Edwards, Jr.,

[4] Determining whether an executory contract may be rejected is a "core proceeding" under 28 U.S.C. § 157(b)(2)(A). The parties consented to the trial of these matters in this Court. Therefore, the Court may enter a final judgment.

[5] *See* Doc. No. 52, ¶ 8.

[6] *Id.* Defendants did not dispute these basic facts regarding Bernard Edwards and his career as a singer, songwriter, and producer.

[7] *See* Trial Tr., April 22, 2016, Pgs. 66-67 (Franson).

[8] *See id*. at Pg. 68, Lns. 4-14.

[9] *See* Doc. No. 52, ¶ 12.

and Mark Edwards.[10] At the time of his death, Alexis Edwards (now deceased) was his former spouse. Debtor was his surviving spouse.[11]

**I. The Probate Case.**

3. Mr. Edwards' financial affairs and assets were submitted to the Court of Probate in Westport, Connecticut (the "Probate Case"). Mr. Franson was appointed Executor.[12]

4. Debtor was represented in the Probate Case by Paul Johnson and Charles McCaghey of the law firm of Ryan, Ryan, Johnson, McCaghey & Deluca, LLP ("RRD").[13] Debtor executed a Fee Retainer Agreement with RRD on October 22, 1996.[14] That Agreement outlined certain disputed claims that Debtor asserted in the Probate Case, for which RRD would represent her.[15] In the RRD Agreement, Debtor agreed to pay RRD a perpetual 10% fee per annum for all amounts exceeding $1.2M in the event of a settlement.[16]

5. In the Probate Case, Debtor asserted a $10M tort claim, a claim for her spousal share of the Probate Estate, and a claim to ownership of a home in Westport, Connecticut (collectively, "Debtor's Probate Claims").[17] The Probate Court rejected Debtor's spousal share claim and her claim to ownership of the home.[18] RRD pursued an appeal of those rulings.[19]

---

[10] *See* Def. Ex. 1, Pg. 1.

[11] *See id*.

[12] *See id.* at 2; *see also* Trial Tr., April 22, 2016, Pg. 70, Lns. 3-14 (Franson). Richard Pober ("Pober") was legal counsel for the Probate Estate. *See* Trial Tr., April 22, 2016, Pg. 75, Lns. 2-3 (Franson).

[13] *See* Def. Ex. 7; Trial Tr., March 3, 2016, Pg. 283, Lns. 17-23 (Herrera-Edwards).

[14] *See* Def. Ex. 6.

[15] *See id.*

[16] *See id.* at ¶ 1(b).

[17] *See id.* at 1; *see also* Trial Tr., April 21, 2016, Pg. 54 (Pober).

[18] *See* Trial Tr., March 3, 2016, Pgs. 194-195 (Herrera-Edwards).

6. The Probate Court's rulings were on appeal when Debtor, Franson (as Executor), and some of the Edwards children attended a court-ordered mediation (the "Mediation") on July 9, 1997.[20] Alexis Edwards did not attend the Mediation, nor did Mark Edwards, Michael Edwards, or Bernard Edwards, Jr.[21] At the conclusion of the Mediation, the attending parties signed a handwritten Stipulation (the "July 9th Stipulation").[22]

7. The July 9th Stipulation stated that "Bambi Edwards shall be assigned full and complete ownership and interest in 37½% of all royalties and other payments received from the copyrights *and other such interests* owned by Bernard Edwards at the time of his death. . . ."[23] There was no mention of "Administration Rights" or "Artist and Producer Royalties."[24] Paragraph 9 of the July 9th Stipulation also provided that the parties would "execute such documents, contracts and agreements as are necessary to effectuate the terms and conditions of this Stipulation."[25]

8. Thereafter, and through July 30, 1997, the lawyers for Debtor and Franson exchanged correspondence and drafts of a settlement agreement.[26]

---

[19] *See* Trial Tr., March 3, 2016, Pg. 195 (Herrera-Edwards).

[20] *See* Trial Tr., April 21, 2016, Pg. 54, Ln. 11 – Pg. 55, Ln. 3 (Pober).

[21] Trial Tr., March 4, 2016, Pg. 50, Ln. 6 − Pg. 51, Ln. 2 (Herrera-Edwards).

[22] The July 9th Stipulation was executed by the Executor and his Attorney, Mr. Pober, James Cousins (counsel for Alexis Edwards), Attorney McCaghey, Anthony Ahern (Guardian Ad Litem for Lead Edwards), Portia Vrtiak, David Edwards, and Debtor. *See* Def. Ex. 12 (handwritten version); Def. Ex. 13 (typed version). At trial, the Parties stipulated that Def. Ex. 13 was an exact typed version of Def. Ex. 12, the handwritten stipulation dated July 9, 1997, except for signatures, which did not appear on Def. Ex. 13.

[23] *See* Def. Ex. 13, ¶ 1 (emphasis added).

[24] *See generally id.*

[25] *Id.* at ¶ 9.

[26] *See* Def. Exs. 14, 15, 18, 20, 21 and 22.

9. A draft "settlement agreement," identified in the record at trial as Def. Ex. 16, was circulated on July 16, 1997. That same day, the Executor's lawyers submitted to the Probate Court an Application for Approval of Compromise of Claim.[27] The Application to the court stated that there was a "proposed compromise settlement" of Herrera-Edwards' Probate Claims.[28] The Application stated that "Bambi Edwards shall receive a participation in the income stream of the copyrights to be received by the estate in the percentage of 37½ percent, net after all expenses."[29] The Application further stated that: the parties would enter into a co-publishing agreement; Franson will act as publisher of the copyrights; Franson will have full and complete administration rights; and Herrera-Edwards will have no administration rights whatsoever regarding the copyrights.[30]

10. At that time, Debtor was also represented by an intellectual property attorney, Ronald St. Onge ("St. Onge"), who billed time to Debtor's file on July 29 and 30, 1997.[31]

## II. The Settlement Agreement, the General Release and the Co-Publishing Agreement.

11. On July 30, 1997, Debtor, Franson and other interested parties executed a document titled "Settlement Agreement" (the "Settlement Agreement").[32] The Settlement

[27] *See* Def. Ex. 17. The Executor's lawyer, Mr. Pober, sent the Application to Debtor's attorney, Mr. Johnson (Def. Ex. 15). There is no evidence in the record of any objection to the Application, or its submission to the Probate Court.

[28] *See id.* at ¶ 3.

[29] *Id.* at ¶ 4.

[30] *Id.*

[31] *See* Def. Ex. 38; Trial Tr., March 3, 2016, Pg. 185, Lns. 4-23 (Johnson).

[32] *See* Def. Ex. 26.

Agreement arose from the same transaction as the settlement of Debtor's Probate Claims at the Mediation.

12. The Settlement Agreement provided, among other things:

> "Bambi Edwards agrees to accept and the estate agrees to take any and all steps necessary to *assign a 37½ percent participation in the income stream from the copyrights* owned by Bernard Edwards Estate on the date of Bernard Edward's death after payment of all costs, expenses and debt related to the copyrights. The participation share of in the income stream would be on a net basis after all estate, income and other taxes and administrative expenses of the estate have been paid. The six surviving children of Bernard Edwards agree to accept the residual of the estate in trust as per the Last Will and Testament of Bernard Edwards."[33]

13. The Settlement Agreement also provided that Bambi Edwards and Alexis Edwards would receive monthly statements while the Probate Estate was open and quarterly statements thereafter, with payments "for their respective shares of the income from the copyrights."[34] It further provided that the [q]uarterly payments shall begin when all estate debts and expenses have been paid."[35] The Settlement Agreement also stated that the parties would enter into a co-publishing agreement, which would provide that "the executor of the estate will act as publisher of the copyrights and will have full administration rights therein" and that "Bambi Edwards and Alexis Edwards will be co-publishers, and will have no administrative rights whatsoever regarding the copyrights."[36] Paragraph 6 of the Settlement Agreement included Debtor's acknowledgement "that she has no administration rights in the copyrights and that any third party would be subject to all terms and conditions as set forth in this agreement."[37]

---

[33] *See* Def. Ex. 26, ¶ 2(c) (emphasis added).

[34] *See id*. at ¶ 4.

[35] *See id*.

[36] *See id*. at ¶ 5.

[37] *See id*. at ¶ 6.

Finally, the Settlement Agreement provided that all "parties agree and approve the claim by Jess S. Morgan & Co. for a 5% fee on all deferred income and other income received by the estate of Bernard Edwards from copyrights as a debt of the decedent."[38] The Settlement Agreement was signed by Debtor, Franson, Alexis Edwards, each of Mr. Edwards' adult children, and the guardian for the one minor child.[39]

14. The parties also executed mutual General Releases as to any and all actions based on any matter that pre-dated the General Releases, July 30, 1997.[40] The General Release executed by Debtor stated that she released JSM and the children of Bernard Edwards from "any, and all manner of action and actions . . . contracts . . . which they have or ever had against them . . . from the beginning of the world to the day of the date of this release, EXCEPT FOR THE TERMS, CONDITIONS AND CONSIDERATION CONTAINED IN THE STIPULATION OF SETTLEMENT DATED JULY 30, 1997, WHICH REMAINS IN FULL FORCE AND EFFECT."[41] The General Release was notarized for Plaintiff by her attorney, Mr. Johnson.[42] The Court finds that the reference in the General Release to the "*Stipulation* of Settlement dated July 30, 1997" refers to the Settlement Agreement.[43]

[38] *See* Def. Ex. 26, ¶ 13.

[39] *See generally id*.

[40] *See* Def. Ex. 25.

[41] *See id*. The General Release was executed by Plaintiff and witnessed by her lawyers, McCaghey and Johnson. *See id.; see also*, Trial Tr., March 4, 2016, Pg. 47, Lns. 1-12 (Edwards).

[42] *See* Def. Ex. 25.

[43] *See id*. (emphasis added).

15. On August 21, 1997, Debtor, Alexis Edwards, and the Probate Estate executed a Co-Publishing Agreement.[44] Paragraph 2 of the Co-Publishing Agreement states, in pertinent part:

> "Grant of Rights.
>
> (a) In consideration of all of the terms and conditions set forth herein and in the Settlement Agreement, Publisher hereby sells, assigns and transfers to Bambi Edwards thirty-seven and one-half percent (37.5%), and to Alexis Edwards twelve and one-half percent (12.5%) in and to all of Publisher's right, title and interest in the Compositions including, without limitation, all copyrights in the Compositions. To such effect, Publisher shall execute and deliver assignments of copyright and other documentation which may be reasonably requested to establish and record such ownership rights.
>
> (b) Bambi and Alexis acknowledge that they shall have no administration rights in and to the Compositions, and that they each grant to Publisher the sole and exclusive right to administer, control, use, exploit, receive income from, and otherwise deal in and for the compositions, throughout the Territory, in perpetuity."[45]

The Co-Publishing Agreement also provided that the "powers granted to Publisher under this agreement are coupled with an interest and are irrevocable for any cause whatsoever."[46] The Co-Publishing Agreement also provided that "Bambi and Alexis each acknowledge that their execution of the Settlement Agreement is a material inducement for The Estate to enter into this Co-Publishing Agreement with them."[47]

16. On September 4, 1997, the Probate Court entered an order which stated:

> "The Court has reviewed and approved the Settlement Agreement entered into by the Estate, Bambi Edwards as surviving spouse and Alexis Edwards as former spouse of the decedent. Disputed claims have been made against the estate by

[44] *See* Def. Ex. 34.

[45] *See id.* at ¶ 2.

[46] *See id.* at ¶ 2(c).

[47] *See id.* at ¶ 4.

> Bambi Edwards and Alexis Edwards and the Settlement Agreement resolves all claims that can be made by Bambi Edwards and Alexis Edwards against the estate. The children of Bernard Edwards have agreed to all terms of the Settlement Agreement and the Court believes the Agreement is fair and equitable for the children."[48]

There is no evidence in the record herein that Plaintiff contested the entry of this order (the "Order Approving Settlement Agreement").

17. Based on the documents in evidence and the testimony in Plaintiff's case-in-chief, the Court finds that the Order Approving the Settlement Agreement was meant to, and did, approve the Settlement Agreement, dated July 30, 1997, which had been executed by all of the affected parties.[49] There is no evidence that the Probate Court ever separately considered or approved the July 9th Stipulation.[50]

18. The Court finds that the intent of the parties to the Settlement Agreement and Co-Publishing Agreement was that the Plaintiff would never hold ownership of the music copyrights; instead, Plaintiff would be entitled to receive payments from BEC equal to 37½% of the income stream from the music copyrights, after payment of all costs, expenses and debt related thereto. Plaintiff never acquired any Administration Rights and never acquired any right to payment of any Artist and Producer Royalties.

**III. The Copyright Assignments.**

19. Once the Probate Case was closed, Franson and Plaintiff executed an Assignment of Copyright, dated January 1, 2000 (the "Herrera-Edwards Assignment"), wherein Franson assigned Plaintiff a 37½% interest in the musical compositions, "reserving, however, the

---

[48] *See* Def. Ex. 40.

[49] *See* Def. Ex. 39.

[50] *See id*.

exclusive right to administer, control, use, exploit, receive income from, and otherwise deal in and for said Compositions . . . throughout the world in perpetuity . . . ."[51] The Herrera-Edwards Assignment also stated that Plaintiff's share of the income stream from the music copyrights was "subject to a lien to secure the payment to Jess S. Morgan & Company, Inc. of 5% of the gross receipts from exploitation of such assigned rights in perpetuity."[52]

20. Franson also executed Assignments of Copyright to six trusts for each of the children of Bernard Edwards (the "Trust Assignments"), assigning to each trust 8.333% of the "Copyright Ownership" and 16.667% of the Administration Rights.[53] Franson, as trustee for each of the six trusts, then executed another Assignment of Copyright (the "BEC Assignment") in favor of BEC, the entity collectively owned by Edwards' children, conveying to it 50% of the "Copyright Ownership" and 100% of the Administration Rights.[54] BEC has held the Administration Rights continuously since January 1, 2000.

21. The Court finds that the Herrera-Edwards Assignment was executed with the intent of implementing the Settlement Agreement and Co-Publishing Agreement. The Herrera-Edwards Assignment did not grant Plaintiff more than what the parties had agreed to in the Settlement Agreement and Co-Publishing Agreement: payment of 37½% of the income stream from the music copyrights, after payment of all costs, expenses and debt related thereto.[55]

---

[51] *See* Def. Ex. 60, Pg. 3.

[52] *See id*.

[53] *See* Def. Ex. 61.

[54] *See* Def. Ex. 59.

[55] *See* Def. Exs. 26, 34 & 60.

22. Plaintiff was represented by counsel (including Mr. Johnson, Mr. McCaghey, and Mr. St. Onge) at all times in connection with the execution of the Settlement Agreement, the General Release, the Co-Publishing Agreement, and the Herrera-Edwards Assignment. There is no evidence in the record to support the theory that Franson, JSM, or BEC did anything to mislead, conceal information from, or trick Plaintiff in any way into executing the Settlement Agreement, the General Release, the Co-Publishing Agreement, or the Herrera-Edwards Assignment. The Court finds no proof of fraud or concealment by the Defendants in connection with any of these agreements.

## IV. After the Closing of the Probate Estate.

23. Since January 1, 2000, BEC, through JSM as its manager, remitted quarterly payments to Plaintiff, either directly or through Plaintiff's accountants or lawyers. It provided Plaintiff with quarterly statements (the "Quarterly Statements") showing the sources of the payments to her and the costs deducted by either BEC or JSM from that income.[56] Payment from BEC was remitted to Plaintiff with each Quarterly Statement.[57] In each of the Quarterly Statements, BEC identified that Plaintiff receives income from "Writer/Publisher Income." Every Quarterly Statement shows the 5% reduction, as payment to JSM.[58] The Quarterly Statements also identify other costs or expenses that are deducted from the total payment made to Plaintiff.[59]

---

[56] *See* Def. Ex. 139 (a composite of every statement provided by BEC to Plaintiff from March 2000 – December 2015).

[57] *See e.g.*, Def. Exs. 82-84.

[58] *See* Def. Ex. 139.

[59] *See id*.

24. In 2005, Plaintiff, through Bert Padell and Joseph Richichi, her CPA and lawyer, respectively, sent a letter to JSM protesting the 5% fee that was being taken by JSM.[60] JSM responded by providing Plaintiff's professionals with a copy of the Herrera-Edwards Assignment. Mr. Padell then sent the attorneys at RRD a fax, attaching a copy of the Herrera-Edwards Assignment with the hand-written query "*why!!*" next to the 5% lien language.[61]

25. Plaintiff did not then pursue any claim against JSM regarding the 5% fee. Instead, Plaintiff, through Padell, renegotiated Plaintiff's fee arrangement with RRD to include a sunset provision of RRD's perpetual 10% legal fee.[62]

## **Conclusions of Law**

1. The Court concludes that the Settlement Agreement, dated July 30, 1997, is the binding, operative and controlling document regarding the resolution of Debtor's Probate Claims.

a. The Settlement Agreement is the only document that was executed by all of the parties affected by the resolution of Debtor's Probate Claims.[63] The July 9th Stipulation was not signed by Alexis Edwards; nor, was it signed by beneficiaries Michael Edwards, Mark Edwards and Bernard Edwards, Jr.[64] Mark Edwards testified credibly that he had never seen the July 9th Stipulation before his deposition in this proceeding.[65]

---

[60] *See* Def. Ex. 76.

[61] *See* Def. Ex. 77.

[62] *See* Def. Ex. 78.

[63] *See* Def. Ex. 26.

[64] *See* Def. Exs. 12 and 13.

[65] *See* Trial Tr., March 4, 2016, Pg. 236, Lns. 21-25 (Mark Edwards).

b. The Settlement Agreement resolved disputed claims affecting the interests of Leah Edwards, then a minor, and the value of the assets exceeded $10,000. Thus, Probate Court approval of the resolution of Debtor's Probate Claims was necessary under Connecticut law.[66]

c. The Settlement Agreement was the only agreement that was approved by the Probate Court. As that court stated in 1997, in the Order Approving Settlement Agreement:

> "The Court has reviewed and approved the Settlement Agreement entered into by the Estate, Bambi Edwards as surviving spouse and Alexis Edwards as former spouse of the decedent. Disputed claims have been made against the estate by Bambi Edwards and Alexis Edwards and the Settlement Agreement resolves all claims that can be made by Bambi Edwards and Alexis Edwards against the estate. The children of Bernard Edwards have agreed to all terms of the Settlement Agreement and the Court believes the Agreement is fair and equitable for the children."[67]

The July 9th Stipulation was not executed by Alexis Edwards and it did not provide for resolution of her claims.[68] It stated only that Alexis Edwards would receive an unidentified percentage of royalties from the Probate Estate.[69] But, the Settlement Agreement, which Alexis Edwards signed, provided for her to receive a 12½% participation in the income stream from the music copyrights to resolve her claims against the Probate Estate.[70] Three of Mr. Edwards' adult children did not execute the July 9th Stipulation; but, all of the adult children and Leah Edwards'

[66] "[W]hen a party is under eighteen years of age, settlement agreements valued at greater than $10,000 must be approved by the Probate Court." *Roe v. Gunnery, Inc.* 2013 WL 1849284, *4 (Ct. Sup. Ct., April 10, 2013); *see also Kowalyshyn v. Leconche*, 2015 WL 7421826 (Ct. Sup. Ct., Nov. 2, 2015) (finding that there was no final settlement agreement because the settlement was subject to approval by the Probate Court, but that the Court's approval was not obtained). Johnson and McCaghey both testified that because there was a minor child (Leah Edwards) involved, the Probate Court had to approve any settlement between the parties to the Probate Estate. *See* Trial Tr., March 3, 2016, Pg. 25, Lns. 17-25 (McCaghey); Trial Tr., March 3, 2016, Pg. 111, Lns. 14-22 (Johnson).

[67] *See* Def. Ex. 40.

[68] *See* Def. Ex. 12.

[69] *See id*.

[70] *See* Def. Ex. 26.

Guardian Ad Litem signed the Settlement Agreement.[71] For these reasons, the Court concludes that it was the Settlement Agreement, not the July 9th Stipulation, that was considered and approved by the Probate Court.

d. The Settlement Agreement was the result of post-mediation negotiations and drafting by attorneys for Plaintiff and the other parties. Plaintiff was represented by counsel, including Messrs. Johnson, McCaghey and St. Onge, during the process leading to the execution of the Settlement Agreement, the General Release and the Co-Publishing Agreement.[72] Plaintiff's own counsel repeatedly cited the Settlement Agreement as the operative agreement resolving Debtor's Probate Claims.[73]

e. The General Release, executed by Plaintiff on July 30, 1997, caused the terms and obligations of the July 9th Stipulation to be released and superseded by the terms and obligations of the Settlement Agreement, which was expressly excepted from the General Release. The July 9th Stipulation is not, therefore, the final, binding agreement that resolved Plaintiff's Probate Claims.[74] Accordingly, the Court rejects Plaintiff's contention that the July 9th Stipulation is controlling.

---

[71] *See* Def. Ex. 26.

[72] *See* Def. Exs. 14, 15, 18, 20, 21, and 22.

[73] *See* Def. Exs. 29 (Letter from McCaghey to Pober citing to the Settlement Agreement), 44 (Request for Approval of Further Advances filed with the Probate Court citing to the Settlement Agreement), 47 (same), 99 (Letter from Minter to Pober citing to the Settlement Agreement and failing to reference the July 9th Stipulation).

[74] Moreover, under applicable Connecticut law, evidence offered to vary or contradict the terms of a fully executed contract is barred by the parol evidence rule. *See Heyman Assoc. No. 1 v. Ins. Co. of State of Pa.*, 653 A.2d 122, 135 (Conn. 1995). Here, because Edwards executed the Settlement Agreement, which was intended to contain the whole agreement, after the July 9th Stipulation, the parol evidence rule bars the use of extrinsic evidence, such as the July 9th Stipulation, to vary or contradict the terms of the Settlement Agreement. *Id.*

**I. Copyright Administration Rights.**

2. The Settlement Agreement is the binding, controlling agreement among the parties now before the Court. It provides that Plaintiff will not have any Administration Rights.[75] The Court concludes that under this controlling document, Plaintiff did not receive Administration Rights to the music copyrights of her late husband. Therefore, Plaintiff is not entitled to reject the executory portions of the related Co-Publishing Agreement in an effort to acquire or re-acquire the Administration Rights for the music copyrights.

a. This Court may not rewrite the terms of the Settlement Agreement.[76] Applicable case law does not allow a court to approve rejection of executory provisions of an agreement and simultaneously rewrite or invalidate portions of a related and otherwise binding agreement.[77] Moreover, rejection does not allow a debtor to avoid a right that has already vested in the counter-party to the agreement or obligations that are fully executed.[78] Rejection relieves a debtor of only its future performance under the contract.[79]

b. The Court rejects Plaintiff's contention that she became the absolute owner of a 37½% portion of the music copyrights by reason of paragraph 2(a) of the Co-Publishing Agreement, which she simultaneously granted back to the Probate Estate/Publisher in paragraph 2(b).

---

[75] *See* Def. Ex. 26, ¶¶ 5 & 6. The July 9th Stipulation does not reference Administration Rights. *See* Def. Ex. 12.

[76] *See In re Giordano*, 446 B.R. 744, 749 (Bankr. E.D. Va. 2010).

[77] *See e.g. Thompkins v. Lil' Joe Records, Inc.,* 476 F.3d 1294, 1306 (11th Cir. 2007) (discussing limited effect of rejection on contract subject to rejection); *In re The Ground Round, Inc.*, 335 B.R. 254, 261 (1st Cir. BAP 2005) (discussing limited scope of rejection and finding that rejection does not modify rights and obligations of the parties even in the rejected contract).

[78] *Thompkins*, 476 F.3d at 1307,1308.

[79] *Id.* at 1306.

c. The Co-Publishing Agreement recites that it is made subject to and in furtherance of the Settlement Agreement.[80] It provides that "Bambi and Alexis acknowledge that they shall have no administration rights in and to the Compositions . . . ."[81] The Court finds that the Co-Publishing Agreement was an artifice, or mechanism by which Plaintiff and Alexis Edwards were granted ownership of their respective shares of the income from the music copyrights, without the Administration Rights. This reading of paragraphs 2(a) and (b) of the Co-Publishing Agreement is consistent with the language of both the Settlement Agreement and the July 9th Stipulation, which speak in terms of rights to a portion of the income derived from the copyrights, not ownership of the underlying copyrights themselves. At times, even Plaintiff has acknowledged that she has no Administration Rights.[82]

3. BEC holds the Administration Rights to Edwards' copyrights.

a. Immediately upon the close of the Probate Case, Franson, on behalf of the Probate Estate, executed multiple "assignments of copyright," including the Trust Assignments.[83] Ultimately, Franson transferred to BEC 50% of the "Copyright Ownership" and 100% of the Administration Rights.[84]

[80] *See* Def. Ex. 34, ¶ 2(a) (stating that the Grant of Rights is made in "consideration of all the terms and conditions set forth herein and in the Settlement Agreement….").

[81] *See id.* at ¶ 2(b).

[82] *See* Def. Ex. 17, ¶ 4 and Def. Ex, 26, ¶ 6. While not dispositive, the Court also notes that Plaintiff's own former lawyer, Kendall Minter, who was retained to negotiate a loan agreement on behalf of Plaintiff, acknowledged in a letter to Messrs. Parviz and Omidvar, that Plaintiff had no Administration Rights. *See* Def Ex. 94.

[83] *See* Def. Ex. 61.

[84] *See* Def. Ex. 59.

b. The execution of the Trust Assignments and the BEC Assignment was meant to satisfy the writing requirement under the Copyright Act.[85] They identify the copyright interests that Franson, on behalf of the Probate Estate, transferred to BEC. Pursuant to the Herrera-Edwards Assignment, Plaintiff received a 37½% interest in the income from the copyrights.[86] Taken together, these Assignments are consistent with the language of the Settlement Agreement, which stated that the Probate Estate would "take any and all steps necessary to *assign a 37½ percent participation in the income stream from the copyrights* owned by Bernard Edwards' Estate on the date of Bernard Edward's death after payment of all costs, expenses and debt related to the copyrights."[87] The Court concludes that since January 1, 2000, BEC has held and owned the Administration Rights regarding Ms. Edwards' music copyrights.

## II. Artist and Producer Royalties.

4. The Court concludes that Plaintiff is not entitled to Artist and Producer Royalties, either retroactively or prospectively.

a. No Artist and Producer Royalties were granted to Plaintiff by the Settlement Agreement. In the Settlement Agreement, Plaintiff agreed to receive only the stated portion of 37½% of the income stream from the copyrights.[88] "Copyright" is a well-understood term and

---

[85] 17 U.S.C.A. §204(a) provides "a transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."

[86] *See* Def. Ex. 60 (reserving the Administration Rights and imposing the 5% lien on the income stream).

[87] *See* Def. Ex. 26, ¶ 2(c).

[88] *See id*.

does not, as argued by Plaintiff, include income from sources other than the compositions themselves.[89]

b. The July 9th Stipulation did not expressly state that Plaintiff would be granted any portion of Artist and Producer Royalties.[90] The terms of the Settlement Agreement, specifying the compromise of Debtor's Probate Claims in exchange for 37½% of the income from the copyrights, after expenses, is neither inherently unfair, nor in conflict with the July 9th Stipulation.

c. Plaintiff argues that the Probate Estate's tax returns, filed on July 17, 1997 (the "Tax Returns"), eight days after the Mediation, establish that Plaintiff was entitled to Artist and Producer Royalties, because these royalties were being received by the estate during the Probate Case and certain tax schedules indicated that Plaintiff received "37.5% of the net estate" pursuant to a "Settlement of Claim dated 7/9/97."[91] Plaintiff also asserts that because these Tax Returns identify a higher marital deduction because of the inclusion of the additional non-copyright income, this indicates that the Probate Estate had agreed, on July 9, 1997, to provide her with more than just the stated percentage of income from the copyrights only. This contention is not persuasive, however, because the Tax Returns also included an exhibit that stated that the "final documentation" for the settlement was not available at the time of filing and

[89] According to the testimony of Marc Stollman, an expert witness for Defendants, a "copyright in a composition generally refers to the words and music" and there are four primary royalties paid in connection with a composition, including 1) mechanical reproduction, 2) public performance, 3) sheet music or books, and 4) synchronization. *See* Trial Tr., April 21, 2016, Pg. 203, Lns. 1-23 (Stollman). Stollman also explained that artist royalties and producer royalties are generally royalties paid for performing or producing a song, but confirmed that the artist or producer is not typically the owner of the copyright in the words or music of a song. *See* Trial Tr., April 21, 2016, Pg. 204, Lns. 14-25 (Stollman). These explanations were corroborated by the testimony of Richard Leher, Plaintiff's expert. *See* Trial Tr., March 2, 2016, Pgs. 64-65, Pg. 92, Ln. 3 – Pg. 93, Ln. 12 (Leher).

[90] *See* Def. Ex. 12.

[91] *See* Def. Ex. 141.

that upon "future request, the estate will provide a copy of the final settlement agreement approved by the Court."[92] The Executor, Franson, testified in this proceeding. His explanation − that at the time of filing, the Tax Returns represented his best efforts to put the IRS on notice of what the marital deduction might be, in the face of the filing deadline − is entirely credible. Further, there is nothing in the record to indicate Plaintiff ever relied on the Tax Returns.

5. Even if there was a question regarding the amounts and sources of income that Plaintiff was to receive as a result of the Settlement Agreement, her claims are barred by any applicable statute of limitations.[93] There is no proof in the record of fraud or concealment by any of the Defendants that might arguably extend any such limitation periods.

a. Both during and after the Probate Case, Plaintiff was provided with statements identifying the source of her income and the amounts that she would receive. In the initial inventory of the Probate Case, prepared by JSM and Franson, the Probate Estate identified two sources of income − money from "Music Copyrights" and "Deferred Compensation."[94] All of the statements generated during the Probate Case were provided to Plaintiff, through her counsel at RRD.[95]

b. After the Probate Case was closed, the Quarterly Statements were also initially provided to Plaintiff, her lawyers at RRD and to her accountant, Maggie Turner.[96] These

---

[92] *See* Def. Ex. 141, Pg. 93.

[93] *See Conn. Gen. Stat*. §§ 52-576, 52-577 and 52-576(a) (establishing 3 year statute of limitations for conversion; 6 years for breach of contract or money had or received); *Fla. Stat.* § 95.11(2)-(3) (establishing 5 year statute of limitations for breach of contract; 4 years for conversion or money had or received); *Cal. Code Civ. Proc.* § 337, 338(c), 339(1) (establishing 4 year statute of limitations for breach of contract; 3 years for conversion; 2 years for money had and received).

[94] *See* Def. Ex. 8, Pg. 1.

[95] *See e.g.,* Def. Exs. 49 and 50.

[96] *See* Def. Exs. 63-65.

statements disclosed that BEC was receiving professional income from "Copyrights" plus the "Deferred Compensation," but that Plaintiff was receiving income only from the copyrights.[97] Turner had worked for JSM prior to working for Plaintiff.[98] She was uniquely qualified to understand the JSM statements.[99] While she worked at JSM, Turner would have known about Bernard Edwards' income; she had the experience to understand the statements provided by JSM to Plaintiff. There is no evidence in the record that Turner was not working for Plaintiff in good faith. There is no evidence in the record that supports any claim that JSM or BEC made any effort to conceal the sources or amount of income from Plaintiff. Thus, as long ago as the first quarterly payment in March of 2000, Plaintiff had reason to know that BEC and JSM were remitting to her the agreed percentage of income only from the music copyrights. There is no evidence in the record that Plaintiff asserted any claim for unpaid Artist and Producer Royalties prior to the filing of AP 641 in 2013. Thus, Plaintiff's claims, if they were otherwise meritorious, could have been raised 19 years ago. They are now time barred.

c. The Court concludes that the Quarterly Statements (Def. Ex. 139) and the manner in which JSM has paid Plaintiff since the close of the Probate Case (December 31, 1999) are consistent with the terms of the Settlement Agreement, which provided that the "[q]uarterly payments shall begin when all estate debts and expenses have been paid."[100] Prior to December 31, 1999, JSM worked with the Internal Revenue Service and Connecticut Department of

---

[97] Def. Exs. 63, Pg. 3 and 64, Pg. 3.

[98] *See* Trial Tr., April 20, 2016, Pg. 60, Ln. 20 – Pg. 62, Ln. 2 (testimony of Mandel regarding Turner's employment at JSM and her job responsibilities on the account of Bernard Edwards).

[99] *See id*.

[100] *See* Def. Ex. 26, ¶ 4.

Revenue regarding audits of the tax returns for the Probate Estate.[101] The debts of the Probate Estate were not fully resolved until the tax audits were completed. The pleadings filed in the Probate Case indicate that the payments under the Settlement Agreement were deferred until the closing of the Probate Case.[102] The Court finds the testimony of Messrs. Franson, Pober, Mandel and Stahl to be plausible and credible as to there not being a workable method to allocate expenses to sources of income during the Probate Case, so that income from all sources was placed into a single account, all of the expenses were paid therefrom, and the interested parties received the remainder based upon the percentages agreed upon in the Settlement Agreement. Their testimony plausibly explains, therefore, why the payments (advances) to Plaintiff during the Probate Case differed from those made after the Probate Case was closed.

**III. The 5% Lien.**

6. Plaintiff cannot now rescind or reject the 5% lien because it is barred, by her previous agreements and by applicable statutes of limitations.

a. The Settlement Agreement, signed by Plaintiff, approved JSM's claim "for a 5% fee on all deferred income and other income received by the estate of Bernard Edwards from copyrights as a debt of the decedent."[103] The Herrera-Edwards' Assignment granted JSM a 5% lien on "the gross receipts" received from the music copyrights.[104] Plaintiff thus agreed in January 2000 to JSM's 5% lien on all income received from the music copyrights. Plaintiff has

[101] Trial Tr., April 20, 2016, Pg. 86, Lns. 15-21 (Mandel).

[102] For example, during the Probate Case, Plaintiff requested advances against her stream of income. In order to obtain such advances, the parties filed pleadings with the Probate Court wherein they acknowledged that there was a Settlement Agreement entered into on July 30, 1997, and as "the estate is still in administration, payments for the income stream have not as yet begun." *See* Def. Exs. 44 and 47.

[103] *See* Def. Ex. 26, ¶ 13.

[104] *See* Def. Ex. 60. The Herrera-Edwards Assignment was provided to Plaintiff's lawyers before she signed it. Def.
(continue)

not presented any evidence or case law establishing that the 5% lien is invalid or was not properly perfected.

b. Even if Plaintiff had any basis to extinguish JSM's 5% fee, the statute of limitations bars her from asserting it in this proceeding. Plaintiff was aware of the 5% lien as of the date of the Herrera-Edwards Assignment, January 1, 2000.[105] Plaintiff was either aware, or should have been aware, that JSM was capturing 5% of all income from the music copyrights at the time she received the first Quarterly Statement in March 2000.[106] In 2005, Plaintiff, through her lawyers, raised the issue of the 5% deduction by sending a protest letter.[107] But, Plaintiff did not then pursue any claim against JSM regarding the 5% fee. Instead, Plaintiff, renegotiated her fee arrangement with RRD to include a sunset provision of RRD's perpetual 10% fee.[108] Based on the foregoing, the Court concludes that the statute of limitations to revoke or challenge the 5% lien would have started to run no later than 2005 and, thus, has long since expired.

c. Under any applicable statute of limitations, all claims asserted in the Amended Complaint relating to the 5% lien or the Artist and Producer Royalties are time-barred.

7. Given that Plaintiff cannot reject the Co-Publishing Agreement, as it relates to the Administration Rights, and Plaintiff is unable to rescind or otherwise avoid the 5% fee to JSM, the Court concludes that there is no benefit to the bankruptcy estate to allow rejection of the Co-Publishing Agreement.

---

(continued)
Exs. 51, 54 and 56.

[105] *See* Def. Ex. 60.

[106] *See* Def. Ex. 139, Pg. 66.

[107] *See* Def. Ex. 76.

[108] *See* Def. Ex. 78.

8. Having considered the documentary evidence, the testimony of witnesses, arguments of counsel, the Motion, the Response and the Reply, and relevant authority, and otherwise being fully advised in the premises, it is hereby

**ORDERED AND ADJUDGED AS FOLLOWS:**

1. The *ore tenus* Motion for Judgment on Partial Findings by Defendants Bernard Edwards Company, LLC and Jess S. Morgan & Co., Inc., is **GRANTED.**

2. The Motion by Debtor to Reject Executory Portions of the Co-Publishing Agreement filed in the Main Case (Doc. No. 370) is **DENIED.**

3. BEC is the proper and lawful holder of the administration rights relating to the music copyrights owned by Bernard Edwards at the time of his death.

4. Final judgment is entered in favor of Defendants, Bernard Edwards Company, LLC and Jess S. Morgan & Co., Inc., as to all counts of the Amended Complaint (Doc. No. 52) filed in the above captioned adversary proceeding.

a. As to Count I of the Amended Complaint, which seeks declaratory relief regarding Plaintiff's interests in the various streams of income, the Court declares that, per the binding agreements of the parties, Plaintiff is entitled to a 37½% interest in the income stream from the music copyrights owned by Bernard Edwards at the time of his death, which does not include any income from Artist and Producer Royalties;

b. As to Count II of the Amended Complaint, which seeks declaratory relief regarding whether JSM is entitled to deduct a 5% fee from income stream from the music copyrights paid to Plaintiff, the Court declares that Defendant, Jess S. Morgan & Co., Inc., holds a valid and proper lien for 5% of the gross receipts on all income received from the music copyrights owned by Bernard Edwards at the time of his death and that

Plaintiff, or any successor in interest to Plaintiff's rights, is bound by the controlling agreements and documents to a compromise which allows JSM to continue to deduct this 5% fee from the gross income stream from the music copyrights;

c. As to Count VII, the Court declares that JSM's 5% lien is not void for a lack of consideration; and

d. As to all other claims alleged in the Amended Complaint, final judgment is entered in favor of Defendants, Bernard Edwards Company, LLC and Jess S. Morgan & Co., Inc.

5. Plaintiff, Bambi A. Herrera-Edwards, shall take nothing in this Adversary Proceeding and shall go hence without day.

6. The Court reserves the right to enter all other orders as may be necessary and proper, including but not limited to an order for reasonable attorneys' fees and costs in favor of Defendants.